DREYFOUS (RICHMOND v.). See Case No. 11,799.

DREYFUS, Ex parte. See Case No. 8,043.

DRIGGS (KETCHUM v.). See Case No. 7,-735.

## Case No. 4,083.

### DRIGGS v. MOORE.

[1 Abb. (U. S.) 440;[1] 3 N. B. R. 602 (Quarto, 149).]

Circuit Court, E. D. Michigan. March Term, 1870.

BANKRUPTCY — INVALIDITY OF PREFERENTIAL ASSIGNMENTS — WHAT IS INSOLVENCY.

1. When an insolvent debtor gives a mortgage in favor of one creditor, with intent to secure to him a preference over other creditors, and such creditor has, at the time, reasonable cause to believe the debtor insolvent, the mortgage is void, by the provisions of the bankrupt law of 1867 [14 Stat. 517].

2. If, from the circumstances under which the mortgage was given, it must necessarily have

[1] [Reported by Benjamin Vaughan Abbott, Esq., and here reprinted by permission.]

operated as a preference, the creditor will not be heard to say, in support of the transaction, that the debtor did not intend to create one.

[Cited in Re Silverman, Case No. 12.855; Goodenow v. Milliken, Id. 5,535; Walbrun v. Babbitt, 16 Wall. (83 U. S.) 581; Curran v. Munger, Case No. 3,487; Alderdice v. State Bank of Virginia, Id. 154.]

3. The question of insolvency is a question of fact, and depends, in part, upon the usage and understanding which prevails in the locality with reference to which the question arises.

4. The rule that a trader who is not able to pay all his debts in the usual ordinary course of business as persons carrying on trade usually do, is to be regarded as insolvent,—approved, as a general rule.

5. Failure to pay a single debt when due, is not sufficient to establish insolvency.

This bill in equity was filed by Frederick E. Driggs, as assignee in bankruptcy of the estate of Tonkin & Trewartha, against the persons composing the firm of Moore, Foote & Co., to recover assets of his assignors, which defendants had sold in virtue of a claim to them under a mortgage executed by the assignors.

Driggs & Pond, for complainant.

Meddough & Lothrop, for defendants.

WITHEY, District Judge. Tonkin & Trewartha, of Eagle Harbor, in the upper peninsula of Michigan, being indebted to defendants, merchants of Detroit, for merchandise, and also on a claim transferred to them in favor of Allan Shelden & Co., amounting in the aggregate to about twelve thousand dollars, on May 9, 1868, to secure the payment thereof, executed to the defendants a chattel mortgage on all or nearly all their personal property, including two stocks of goods at Eagle Harbor. To induce the giving of the mortgage, defendants extended time for payment, so that the first payment of eight hundred dollars would become due July first after the date of the mortgage, and a like sum monthly thereafter until the whole sum of twelve thousand dollars, with interest, should be paid. On July 15, the first installment not having been paid, defendants took possession of the mortgaged property, and a few days after sold the same at public vendue. On August 3, Tonkin & Trewartha filed a petition to be declared bankrupts, and were afterwards duly adjudged to be such. Their assignee, the complainant, files a bill against defendants to recover the value of the property taken and sold under said mortgage, alleging that the mortgage was made within four months before the petition in bankruptcy; that Tonkin & Trewartha, at the date of the mortgage, were insolvent; that it was made with a view to give a preference, and that defendants had reasonable cause to believe their debtors insolvent, and the transaction to be in fraud of the provisions of the bankrupt act. The giving of the mortgage, and the then insolvency of Tonkin & Trewartha, are admitted by the

defendants, but they deny that their debtors made the mortgage with a view to give a preference, and deny that defendants had reasonable cause to believe their debtors insolvent, or that the mortgage was made in fraud of the provisions of the bankrupt law.

The bill of complaint presents a case under the first provision of section 35,—viz: of a transfer with a view to give a preference;—and it is urged by defendants' counsel that this provision is not within the operation of the third paragraph of the section, which declares: "And if such sale, assignment, transfer, or conveyance is not made in the usual and ordinary course of business of the debtor, the fact shall be prima facie evidence of fraud." The question is, what "sales, assignments, transfers, and conveyances" are referred to in the clause just read? It follows two provisions, the first of which declares that "any payment, pledge, assignment, transfer, or conveyance," made within four months by the insolvent debtor, "with a view to give a preference," shall be void; the second, that "any payment, sale, assignment, transfer, conveyance, or other disposition," within six months by the insolvent debtor of his property, "with a view to prevent his property from coming to his assignee in bankruptcy," &c., shall be void. It was said at the argument, the clause as to what shall be prima facie evidence of fraud, does not refer to the first provision; among other reasons, because the word "pledge" is not in the fraud clause, and is in the first provision; and so the word "sale," employed in the second provision but not in the first, is used in the third or fraud clause. The same reasoning would prevent the third paragraph from applying to either of the former provisions; for the word "payment," employed in both of them, is not used in the fraud clause, and the words "other disposition," employed in the second paragraph, are not in the third. The words "sale, assignment, transfer, or conveyance," employed in the third paragraph, are of comprehensive import, and embrace almost every disposition of property, whether absolute or conditional. Both the antecedent paragraphs refer to and are designed to protect the property of the insolvent, and the clause as to fraud is also designed to the same end. All these provisions relate to the same subject or thing,—namely, the property,—and all three aim to protect property of insolvents from fraudulent disposals. My conclusion is in harmony with the rulings in the courts of bankruptcy so far as decisions have come under my notice, and with the opinion of the supreme court of Massachusetts in reference to a like provision in the insolvent laws of that state. When, therefore, it was shown in this case that Tonkin & Trewartha were insolvent, and gave a chattel mortgage of their goods to secure a debt which they owed, there was established a case of fraud prima facie—for that mode of transfer by a trader of his goods, is not one in the usual and ordinary course of his business, but is unusual and exceptional.

We are now to inquire whether the mortgage was made with a view to give a preference to defendants. Whether it was, rests upon the facts, and I refer to Trewartha's testimony first. He says: "I knew"—May 9, 1868, the date of the mortgage—"if we were called upon to pay all our indebtedness at the time, it would be impossible to do so; our only hope was to continue in business, and by using profits yet to be made, we might pay our debts. Next, Mr. Tonkin testifies: "In March, 1868, on reviewing the state of my business, I felt that if demands were pressed upon me for all the debts I owed, I should fall far short of paying them." And they say they were averse to giving a mortgage to defendants; they did so only when pressed, and becoming satisfied it was their only way to ward off the blow which threatened their business. Mr. Maynard went from Detroit to Eagle Harbor in May, and obtained from Tonkin & Trewartha the mortgage on their goods, as the agent and attorney of defendants. He testifies: "Trewartha said he did not see why we wanted securities, as he had given me a full statement of their standing, and that we could see that they had a surplus of between twelve and thirteen thousand dollars. I said to him that in case security was given, I should be willing to fix the time and amount of payments to be made to suit their convenience." He then states that Tonkin "expressed some dislike to giving a chattel mortgage," and "wanted to know if they could rely upon the defendants giving them additional credit in case they should execute the mortgage. I informed them they could." Now it turns out that the statement which Tonkin & Trewartha made of their standing to Mr. Maynard, at the time of giving the mortgage, was not truthful; that in fact they owed more than their assets amounted to. They covered up their real condition by a false statement, well knowing the result if their true condition was made known. It may be true that they hoped to work out, and one means to that end was to obtain time in which to pay their debts. The learned counsel for defendants claim that Tonkin & Trewartha's view was not to give a preference, but to gain time, and, from profits to be realized from trade, pay their debts: that while the mortgage has operated to give defendants preference, it is because of the failure of the mortgagors to realize their hopes and expectations, and is but an incident, and was not the object of the mortgage. It is said, too, their reluctance and aversion to giving a mortgage is evidence that they did not give it with a view to a preference.

If we pause and ascertain first, that the mortgagors knew they were utterly insol-

vent; that they had large indebtedness past due to these defendants and others, which they were wholly unable to pay, and that, bad as their credit was before giving the mortgage, it would be utterly gone after executing it with every one who should know of its existence—and that its existence would be open to all in the town clerk's office—there would seem no escape from the conclusion that Tonkin & Trewartha must have known and realized that a mortgage to defendants of their property would be a preference. It is wholly untenable to say, that traders who know themselves to be insolvent, can mortgage their property to secure a pre-existing debt without entertaining the view that such action is a preference. The court is to judge of the transaction from Tonkin & Trewartha's standing at the time, and if it appears that their condition was such that a mortgage must operate as a preference, it cannot be allowed, because there was a possibility of their earning in the future enough to pay all their debts, and hoped so to do, that, therefore, there was no intention or view to give a preference. It matters not what was their principal motive; if they were actually insolvent and knew it, they will not be allowed to pledge all their property, or any part of it, to one creditor, leaving the other creditors dependent in whole or in part upon the trader's subsequent good or ill fortune in business enterprises. The court regards this view to be in harmony with the spirit and intention of the bankrupt act; any other view renders the provision of the law under consideration as worthless as a rope of sand, and as opening a door to evade one of the most salutary provisions of the bankrupt act. Mr. Justice Swayne, in Farrin v. Crawford [Case No. 4,686], used the following language: "Assuming, then, that he (the debtor) was insolvent and knew it, it follows at once that any payments then made by Farrin to any creditor in full, were with intent to prefer, and, therefore, acts of bankruptcy within the meaning of section 39 [14 Stat. 536]." Section 39 employs the same language as section 35, viz: "With a view to give a preference." Hence the ruling of Mr. Justice Swayne is applicable to the case at bar. The court holds the mortgage by Tonkin & Trewartha to defendants to have been made with a view to give a preference.

And the question remains whether defendants had reasonable cause to believe Tonkin & Trewartha insolvent, and that the mortgage was made in fraud of the provisions of the bankrupt act. This is frequently one of the most difficult, as it is one of the most important questions arising under the law, involving, as it often does, large amounts growing out of payments, mortgages, and transfers by a debtor, and involving questions of construction and fact. Perhaps no precise rule can be laid down which will be applicable to all cases, inasmuch as the determination of each case rests largely upon

its own peculiar facts. It is generally held by the bankrupt courts that a trader who is not able to pay all his debts in the usual and ordinary course of business, as persons carrying on trade usually do, is insolvent within the meaning of the bankrupt laws, and I know of no better general rule by which to be governed in considering the facts of a case. It is neither too broad nor too narrow; while, in my opinion, it would be quite too narrow and restricted to hold that failure to pay some one debt when due is evidence of insolvency in all cases under the act, though I believe it has been held that if a trader does not pay a debt when it matures, he is to be regarded insolvent. This, as a rule applicable to traders generally in this country, I cannot indorse. Whether a single instance of non-payment of a debt at maturity would be evidence in a given case of insolvency, depends somewhat upon the magnitude of the debt, upon the locality of the debtor, and upon what is the ordinary course of business and custom in that respect of the locality where the debtor resides, and upon such other facts and circumstances as will bear upon the question of insolvency. Suppose a debtor residing in a small country town, in an agricultural district, or in the mining regions of this state, where debtors are not usually prompt to meet their debts as they mature, and an item of indebtedness is not paid at maturity, while at the same time the debtor is of known responsibility, having two dollars or ten dollars of assets to one dollar of indebtedness, and enjoying good credit—to say such debtor is insolvent simply because he fails to pay the debt at maturity, is obviously incorrect. It ignores the usage and course of business recognized between the creditor and debtor class in that locality, and would present the spectacle of the mercantile class saying a trader is solvent, and the courts saying he is insolvent; whereas the courts, upon such questions, should adopt the mercantile usage as the rule of decision. The question is, whether the debtor or trader is able to pay his debts in the ordinary course, as persons carrying on trade there usually do. Hence it may be, and undoubtedly is true, that insolvency in New York, Boston, Philadelphia, and other commercial centers, is not insolvency in small country towns. In the former places, if the debtor's paper is dishonored, his credit is gone, and he is prima facie insolvent; whereas in the latter localities it is not so. Insolvency is a fact, and not a matter of definition or rule of law, as was said at the argument; and what is evidence of insolvency in London, or Paris, or New York, is not evidence of insolvency everywhere. The rule first stated, that a trader who is not able to pay all his debts in the usual ordinary course of business, as persons carrying on trade usually do, is to be regarded insolvent, is sufficiently liberal to admit all the necessary tests in determining the ques-

tion of insolvency. What now are the facts from which we are to draw our conclusions, whether the defendants had reasonable cause to believe their debtors insolvent at the time Tonkin & Trewartha made the mortgage—May 9, 1868?

[2][Defendants commenced selling to the bankrupts goods on credit in 1866, and continued up to about November 10, 1867, when they sold the last bill prior to the mortgage. Then Tonkin & Trewartha owed defendants an amount, past due, of two thousand five hundred dollars. The November purchase added to the indebtedness three thousand seven hundred dollars, and Tonkin & Trewartha also gave defendants, at that time, their draft for five hundred dollars on Head & Perkins, of Boston, at ten days, which was never paid. Tonkin & Trewatha at that time gave defendants their six notes for eight hundred and seventy-five dollars, due monthly thereafter. There was also five hundred and ninety-nine dollars in account, falling due December 7; total indebtedness, six thousand three hundred and forty-nine dollars. They also purchased from Allan Shelden & Co., of Detroit, and were indebted to them for merchandise, at the same time, four thousand six hundred dollars. They gave Allan Shelden & Co. a draft for five hundred dollars, at ten days, on the same parties as the draft to defendants, which was not paid. The indebtedness to Allan Shelden & Co. also came due monthly. We may presume that the November credit was induced largely by a statement made by Tonkin & Trewartha, in October previous, showing assets, thirty-nine thousand dollars; liabilities, eighteen thousand dollars; surplus, twenty-one thousand dollars. But it appears that on the 9th of January following, defendants had received no payment from their debtors, and learning there was a mortgage on the stock to Chicago parties to secure the payment of seven or eight thousand dollars, became solicitous about their debt, and wrote Hubbell & O'Grady, attorneys at Houghton, inclosing a statement of their debt, with that of Allan Shelden & Co., and also of J. J. Bagley, in the aggregate amounting to over twelve thousand dollars. In their letter of instructions appears the following: "We wish you to go at once to Eagle Harbor and examine closely into their affairs, and in the first place, see if their statement made accords with their condition. We don't want to break them up if they can go through, nor do we want to jeopardize our claims by waiting until every one else has their claim secured or paid. Please be particular, and see what shape the debt was in that they gave chattel mortgage for—as we think the bankrupt act would force them in to take pro rata with other creditors, if Tonkin & Trewartha could not pay in full. But if statement made by Tonkin when here was true, they must be solvent.

---

[2] [From 3 N. B. R. 602 (Quarto, 149).]

After looking into their matters, we want you to take such steps with inclosed claims as in your judgment may seem best for our interest." The October statement was sent to Hubbell & O'Grady, as a guide to their investigations, and January 20, Mr. O'Grady wrote defendants, "I am happy to inform you that their matters are sound, in my best judgment."

[Now, Tonkin & Trewartha state their assets at fifty-two thousand dollars; liabilities, twenty-five thousand and thirty-one dollars; and Mr. O'Grady writes, if two thousand dollars are deducted from accounts—calling them three thousand dollars—and ten thousand dollars are deducted for excessive estimate of stock, "this leaves them nearly fifteen thousand dollars ahead." He reports as incumbering their merchandise a mortgage for eight thousand dollars, dated October, 1867, payable one thousand dollars monthly, on which fifteen hundred dollars only was paid; and another mortgage given December 24, to secure three thousand two hundred dollars, on which five hundred dollars was unpaid, and due forty days from date of mortgage. This mortgage, he states, was given to prevent their goods being attached for a bill bought in November. Tonkin & Trewartha's statement, transmitted to defendant by Mr. O'Grady, omitted indebtedness upon the two five hundred dollar drafts before alluded to, and this was noticed by defendants, and Mr. O'Grady's attention called to the fact, who accounted for the omission as inadvertence on Tonkin & Trewartha's part. He says, in his reply, "I have set a good, careful, and vigilant watch upon the concern." One of defendants, having in charge this business, Mr. Bagley, testifies that when he received Mr. O'Grady's statement, he believed Tonkin & Trewartha were sound. Early in March defendants procured Mr. Hoar, a man of mercantile experience at Houghton, to go to Eagle Harbor and look after their debt. On the 29th of February, defendants purchased Allan Shelden & Co.'s debt against Tonkin & Trewartha, at fifty cents on the dollar; most of it was past due; so that in March defendants held about twelve thousand dollars of Tonkin & Trewartha's indebtedness. Mr. Hoar testifies that, after looking into their affairs, and making inquiries of them, he was satisfied Tonkin & Trewartha were good. He so reported to defendants, and stated their assets over liabilities at twenty thousand dollars. Mr. Chadburn accompanied Mr. Hoar in the interest of defendants, and his testimony accords with that of Mr. Hoar.

[The next step is in the early part of May, 1868, when defendants, being without remittances from their debtors, procured their attorney, Mr. Maynard, of this city, to go to Eagle Harbor and look after their debtors' standing. Mr. Bagley testifies that his instructions to Mr. Maynard were, "If they were sound, not to disturb them, but give

them all the time they wanted; if they would give security we would carry them through —means by that we would give them goods until they were able to turn themselves and pay their debts." Mr. Maynard testifies that defendants "expressed to him a good deal of anxiety about the claim," and wished him to go to Eagle Harbor and examine into Tonkin & Trewartha's pecuniary condition, and do whatever he thought best for their interests. If satisfied they were good, with sufficient means to pay what they owed, and go along in business, time might be given them, and defendants would give them additional credit, provided security was given to pay defendants' bill. Mr. O'Grady, of Houghton, accompanied Mr. Maynard from that point. Both agree substantially as to what was said and done. Arriving at Eagle Harbor, inquiry was made of resident parties concerning the condition of Tonkin & Trewartha, and they were told that while trade was dull, the parties were regarded sound, and that any statements they might make concerning their standing and affairs could be relied upon. Tonkin & Trewartha now made their last statement before executing the mortgage, and it exhibited: assets, thirty-one thousand seven hundred and four dollars; liabilities, eighteen thousand eight hundred and seventy-six dollars; assets over liabilities, twelve thousand eight hundred and twenty-eight dollars. They were urged to give defendants security, but said in reply, "They were perfectly good, and could pay every dollar they owed as soon as they could convert their property into money, and would have a handsome surplus left." Mr. Maynard says: "I answered that to go along successfully with their business, and meet their liabilities from the sale of their goods and the collection of their accounts, they would require a long extension on at least a portion of their indebtedness, and that they would necessarily need additional credit; and that inasmuch as our claim comprised nearly two-thirds of their entire indebtedness. I thought it not unreasonable to ask security. I said to them that in case security was given, I should be willing to fix the time and amount of payments to be made to suit their convenience." Thus the business was talked up, and, therefore, we obtain the views of the parties, and a pretty good understanding of how defendants regarded the debtors' standing and prospects when the mortgage was given. Mr. Allan Shelden testifies that defendants said they wanted to buy Allan Shelden & Co.'s demands against Tonkin & Trewartha, because their debt was past due, and they desired to control both; thought their debtors good, and could collect. Mr. Shelden further says, about the time they transferred their claim to defendants, February 29th, the failure of Tonkin & Trewartha to pay was a subject of conversation between them and defendants. He also says they sold their debt, amounting to four thousand six hundred and fifty dollars, for fifty cents on a dollar, because they considered the debt doubtful, and concluded they would rather take that than take the risk. Now, we must remember that Allan Shelden & Co. and defendants were alike conversant with Tonkin & Trewartha's statements, and both experienced business houses. July 1st, the the first of the notes secured by the mortgage came due, and was not paid. Mr. Bagley arrived at Eagle Harbor just before the middle of the month, and caused the mortgage to be enlarged to cover accessions to Tonkin & Trewartha's stock, amounting to about two thousand dollars, of which six hundred dollars were purchased from defendants in June on credit. Mr. Bagley testifies: "Their statement then made (in July, when he arrived at Eagle Harbor) was different from the statement made before; I was satisfied there was a leak, or that they hadn't the assets they represented to me they had; I made up my mind it was no object to go on and advance four thousand or five thousand dollars more goods, and I took possession of the stock." An inventory was now taken of the property covered by the mortgage, which amounted to seventeen thousand three hundred and eighty-four dollars. On a sale this property brought ten thousand two hundred and seventy-six dollars. The only other fact I deem it important to state is, that it appears in evidence that it is a common occurrence for traders in the Lake Superior region to fail in paying their debts at maturity.

[Such are the principal and controlling facts of this case, and now the question recurs, had the defendants reasonable cause to believe their debtors insolvent? The several statements put in evidence, furnished by Tonkin & Trewartha to defendants, are important in the consideration of this question. The one made in October, 1867, represented twenty-one thousand dollars assets over liabilities; that of January following, represented twenty-six thousand nine hundred and sixty-seven dollars; Mr. Hoar, who investigated the condition of the bankrupts in March, reported twenty thousand dollars; and that made to Mr. Maynard and Mr. O'Grady, when the mortgage was taken in May, exhibited not quite thirteen thousand dollars of assets over liabilities. All these statements were made within a period of seven months. Tonkin & Trewartha were surrounded by, and mostly dependant upon a mining population for trade. Mining operations were not active during the winter of 1867–8—copper was low, and business much depleted—and Tonkin & Trewartha's trade had been very light during that winter. The facts were understood by both debtors and creditors.

[In the light of these facts, let the four statements of the debtors be examined; and we must assume that defendants did not fail

to notice the discrepancies. Between the October and January exhibits—about three months—there was shown to have been gains of nearly six thousand dollars, and yet in the time not a dollar paid to Allan Shelden & Co. or defendants, that I can discover, and certainly nothing after November 10th. Besides, trade was dull. The March statement exhibited a shrinkage since January 20th, of nearly seven thousand dollars. I think defendants, in view of such varying statements, might well question the correctness of such exhibits, and feel exceedingly anxious concerning their debt, when, about the first of May, they sent Mr. Maynard to Eagle Harbor. Again, Mr. Maynard and Mr. O'Grady must be presumed in possession of the facts to which we have referred, at the time of their visit to Tonkin & Trewartha. Now, the statement made showed assets over liabilities between twelve and thirteen thousand dollars, and compared with the last preceding statement of March, the shrinkage was more than seven thousand dollars—in about two months—while, by a comparison with the January statement, the assets of Tonkin & Trewartha had shrunk over fourteen thousand. Taken in connection with other facts, I regard these statements sufficient to afford reasonable evidence to an impartial judgment that Tonkin & Trewartha's solvency was to be distrusted—quite as much in May as in July following. That there was reason to believe them insolvent in July, is admitted by Mr. Bagley, one of the defendants. He says, when he arrived at Eagle Harbor in July, "Their statement then made, was different from statement made before, and I was satisfied that there was a leak, or that they hadn't the assets they represented to me they had." If a difference between the July statement and former statements was cause to conclude Tonkin & Trewartha had not the assets they represented themselves to have, then the difference or discrepancy between previous statements, afforded equal ground to regard them not as good as they represented. When Mr. Bagley went to Eagle Harbor in July, it does not appear that he made any detailed examination of the debtors' condition before taking possession of the stock under the mortgage; but on seeing and talking with them, became satisfied from the statement then made, that they were no longer able to pay their debts. I can discover nothing in the testimony to justify the conclusion that Tonkin & Trewartha were less able to pay than at the time the mortgage was made, except the single fact that they had now failed to make the July payment of eight hundred dollars on the mortgage. As early as February 29th, Allan Shelden & Co. realized the doubtful responsibility of Tonkin & Trewartha by selling to defendants their debt for fifty cents on a dollar. Is it probable that they would have done this if they had regarded Tonkin & Trewartha solvent? Do business men dispose of their bills receivable against solvent debtors at fifty cents on a dollar?][2]

There are, to my mind, exhibited by the facts in this case very strong reasons for defendants not only to have suspected, but believed their debtors insolvent, outside of the consideration that there was other past due indebtedness of considerable amount. Defendants did feel extremely anxious as to the ultimate payment of their debt, as is shown by the evidence. That they distrusted Tonkin & Trewartha's solvency is apparent from their sending, on three different occasions, agents and attorneys to investigate their debtors' standing; also, from information received that there had been placed upon the debtors' stock two mortgages for considerable amounts; and again, from the fact that defendants were not only anxious to obtain security for their debt, but did not rest satisfied until it was accomplished. Now, considered in relation to their own past due debt, it would seem to be the policy of the bankrupt act not to allow a creditor, under such circumstances, to take a transfer of a debtor's property by way of preference, payment, or security. Transfers made in the usual and ordinary course of a trader's business, or payments made at the time a debt matures, and in the usual mode of paying debts, are prima facie valid. On the other hand, whenever a creditor is in possession of such facts and circumstances in reference to his debtor's standing as arouse suspicion with regard to his solvency or ability to meet his indebtedness, the creditor is so far put upon inquiry that he will not be allowed to shut his eyes to those facts and circumstances, and obtain payment of a debt, otherwise than as it matures, or take security or a transfer of property from the debtor to the prejudice of other creditors. If he does so, and his debtor comes into bankruptcy within four or six months, as the case may be, the creditor must be held to have had reasonable cause to believe his debtor insolvent, and that the transfer was in fraud of the provisions of the bankrupt act. Any other view detracts greatly from the most wholesome operation of the law. Not paying debts in the usual and ordinary course of a trader's business from lack of present means and want of ability to raise means, must be regarded as prima facie evidence of insolvency, and the creditor who has knowledge of such facts must act in view of them. It is undoubtedly true that defendants and their agents and attorneys had no idea of the utterly insolvent and bankrupt condition of their debtors, as the proofs now show their debtors' condition to have in fact been. But we must not forget that there is a clear distinction between insolvency and bankruptcy. A trader may be insolvent and yet not be bankrupt. There is one view of this case which settles

[2] [From 3 N. B. R. 602 (Quarto, 149).]

the question we are discussing, and it is this: Tonkin & Trewartha were largely indebted, most of it past due, and they professedly wholly unable to meet that indebtedness or any considerable part of it, in the usual course of business as those debts matured, and this was known to defendants. Tonkin & Trewartha were not only unable to pay as their debts matured, but confessedly unable to do so within a reasonable time, either from present means or through the aid of their credit and property, which solvent men are usually able to do. They were not, in May, and for months before had not been, able to pay their debts past due. They were pressed from time to time for payment or security, and month after month continued to dishonor note after note as they matured. Their condition was such as to cause their pecuniary standing to be discussed by their creditors, and their over-due and unmatured paper to sell at fifty cents on the dollar. This state of things betokens beyond any chance of mistake, not only that Tonkin & Trewartha were insolvent within the rule of not being able to pay their indebtedness as it became due. in the usual and ordinary course of their business, but, as all this was known to defendants, that they had reasonable cause to believe their debtors insolvent when the mortgage was made; not that they believed, but had reasonable cause to believe. It follows, as a necessary inference, that a mortgage made under such circumstances was a fraud upon the provisions of the bankrupt act. Having already found that the mortgage was made with a view to giving a preference, it follows that there must be a decree in favor of complainant for the value of the property taken by defendants. I shall adopt the amount brought on sale as the fair value. This was ten thousand two hundred and seventy-six dollars, from which is to be deducted the mortgage lien on the property paid by defendants, one thousand eight hundred and twenty-five dollars. the remaining sum, with interest thereon to this date—one year and seven months— being nine hundred thirty-six dollars and sixty-four cents,—gives the amount of the decree, nine thousand three hundred and eighty-seven dollars and sixty-four cents. Decree accordingly.